**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| THERESA CUSATIS, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| ATLANTIC WASTE SERVICES, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Theresa Cusatis and brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* Plaintiff alleges that Defendant Atlantic Waste Services, Inc. subjected her to discrimination based on sex and age, including by subjecting Plaintiff to a hostile work environment, and by subjecting Plaintiff to retaliation after she engaged in protected activities, respectfully showing as follows:

## JURISDICTION AND VENUE

### 1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331, 1343, & 1391 and the enforcement provisions of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.

### 2.

Venue is proper in this judicial district and the division of this Court because the events underlying this action, occurred in Chatham County, Georgia, which is located in this judicial

district and division, pursuant to 28 U.S.C. § 1391, 42 U.S.C. § 2000e-5(f)(3), and the Rules of this Court.

## PARTIES

3.

Plaintiff Theresa Cusatis (hereinafter, "Plaintiff" or "Cusatis") is a citizen of the United States and a resident of Georgia.

4.

At all times relevant times, Ms. Cusatis was considered a covered, non-exempt employee under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.

5.

Defendant Atlantic Waste Services, Inc. (hereinafter, "Defendant") domestic profit corporation, incorporated under the laws of the State of Georgia.  Defendant's principal office is located at 125 B Pine Meadow Drive, Pooler, Georgia 31322.  Defendant may be served with process by delivering a copy of the Summons and Complaint to its Registered Agent Ben B. Wall, located at 125 B Pine Meadow Drive, Pooler, Chatham County, Georgia 31322.

6.

Defendant has employed in excess of one hundred (100) employees, working for at least 20 calendar weeks in 2020 and preceding years.

7.

Defendant is a waste collection and disposal company, offering such services in and around the Savannah metropolitan area.  As a result, Defendant is engaged in an industry affecting interstate commerce.

8.

Defendant is a covered employer within the meaning of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.

9.

Defendant receives federal grants of assistance and otherwise contracts with the federal government, and Defendant is therefore a covered employer under the Rehabilitation Act.

10.

Defendant is a covered enterprise pursuant to the Fair Labor Standards Act.

**STATEMENT OF FACTS**

11.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 10, as if the same were set forth herein.

12.

Shortly after Defendant was established in the year 1999, Ms. Cusatis was recruited away from her former position and she began her employment with Defendant.

13.

Ms. Cusatis earned several promotions over the years, and she served most recently as Defendant's Sales Manager.

14.

At all relevant times, Ms. Cusatis' performance was exemplary.

15.

Ms. Cusatis' exemplary performance was also reflected by her compensation.  Since Ms. Cusatis' base pay was just over $30,000.00 per year, the vast majority of her six-figure

compensation was based on her commissions, as calculated under Defendant's Compensation Structure. Ms. Cusatis did very well in her sales efforts on behalf of Defendant.

16.

Similarly, notwithstanding a written warning in 2014 and her termination at issue in this litigation, Ms. Cusatis had not been subjected to any disciplinary actions in her approximately twenty-one (21) years of employment with Defendant.

17.

In fact, Defendant's current Chief Executive Officer (hereinafter, "CEO"), Ben Wall, has testified under oath that that, at the time of Ms. Cusatis' separation, Defendant could not afford to lose Ms. Cusatis, and that after her separation he wanted Ms. Cusatis to return.

18.

After she was terminated, Ben Wall also made several attempts to have Ms. Cusatis agree to return to the company – albeit, in a lower position and/or with a reduction in pay.

19.

Ms. Cusatis turned sixty (60) years of age in the year 2019.

20.

Around that time, Ms. Cusatis began to feel as though her employment was in jeopardy as a result of her age.

21.

Specifically, the late Burke Wall, the founder of the company who was CEO at the time, (hereinafter, "CEO Wall") had made numerous comments to Ms. Cusatis and others concerning her age.

22.

CEO Wall had told others that he intended to demote Ms. Cusatis, suggesting that her age was the reason.

23.

CEO Wall had also made comments to Ms. Cusatis, suggesting that as a result of her age she was losing her mental acuity.

24.

Meanwhile, then-Vice President Ben Wall (hereinafter, "VP Wall") had been known to openly express his preference for having younger individuals serve in management.

25.

On at least one occasion, VP Wall was discussing Ms. Cusatis with a visitor to the worksite and VP Wall referred to Ms. Cusatis as a "dinosaur," a statement that was clearly intended as a negative reference to Ms. Cusatis' age.

26.

Moreover, immediately before she was terminated, CEO Wall threatened to fire Ms. Cusatis and two of her subordinates who were 54 and 58 years old, respectively. As a result, it was CEO Wall's express intent to fire solely the three oldest employees in Defendant's four-person sales department.

27.

Ms. Cusatis' suspicion that her job was in jeopardy once she turned 60 was supported by the fact that Defendant advertised Ms. Cusatis' position on indeed.com in January 2020, just a handful of months prior to her ultimate termination.

28.

Additionally, shortly prior to the incident that Defendant erroneously cited for terminating Ms. Cusatis' employment, one of CEO Wall's relatives told Ms. Cusatis in a casual conversation that CEO Wall planned to get rid of one of his employees who had worked for Defendant for more than twenty years.  Ms. Cusatis believed that she was the unnamed employee whom this comment was intended to refer.

29.

As a result, when Ms. Cusatis was ultimately terminated in June 2020, she believed that her age was indeed a factor.

30.

Defendant replaced Ms. Cusatis with an attractive female employee who was at least twenty years younger than Ms. Cusatis.

31.

While Defendant purported to have policies prohibiting discrimination and harassment, Defendant has a long history of failing to use these policies to address inappropriate conduct in the workplace.

32.

Defendant also does not offer its employees any training concerning sexual harassment.

33.

For example, early in Ms. Cusatis' tenure, a male coworker abruptly displayed his genitalia to Ms. Cusatis in the workplace.  Ms. Cusatis reported the conduct to CEO Wall, but CEO Wall was dismissive and rude in his response.  For this reason, Ms. Cusatis felt as though she could not complain about such conduct in the future.

34.

On another occasion, one of Defendant's employees attached a dildo to the outside of a coworker's personal vehicle, which the coworker did not discover until he picked his child up from school.   While this incident was also reported to management, Defendant failed to take any corrective action.

35.

In 2015, Defendant hired Jeff Freas as its General Manager (hereinafter, "GM Freas").

36.

Indeed, GM Freas exhibited a pattern of intimidation and abrasive conduct in his management of the company.  As a result of GM Freas' attitude, he and Ms. Cusatis had a few confrontations over the years.  In an attempt to avoid his abuse and harassment, Ms. Cusatis largely tried to avoid him and focus on her own work.  However, GM Freas also subjected Ms. Cusatis and other female employees to inappropriate behavior of a sexual nature.

37.

One example of such harassment occurred in GM Freas' office in January 2020.  While Ms. Cusatis and GM Freas discussed a sales-related topic, GM Freas stood up, leaned against his desk, and embraced Ms. Cusatis while pulling toward his body.  He proceeded to tilt his head back and move his mouth toward Ms. Cusatis' as though he was going to kiss her.  Ms. Cusatis was able to turn her cheek to avoid a kiss and she immediately left his office in disgust.

38.

After Ms. Cusatis told Defendant's HR Manager what has occurred, Ms. Cusatis asked if the HR Manager had heard of GM Fres engaging in any similar conduct previously.  The HR Manager confirmed that she had indeed heard such reports.

39.

Around the same time, on January 31, 2020, Ms. Cusatis experienced another, similar incident of harassment by GM Freas.  Ms. Cusatis went to visit GM Freas in his office in order to discuss a corporate customer that was threatening to cancel its account.

40.

While Ms. Cusatis was showing GM Freas a provision of the customer's contract, GM Freas signaled to Ms. Cusatis that she should move closer to the side of the desk where GM Freas was seated, which Ms. Cusatis presumed was so he could review the documentation she had.

41.

When Ms. Cusatis moved closer, GM Freas spread his legs and placed his hand on the small of Ms. Cusatis' back.

42.

GM Freas then tried to pull Ms. Cusatis closer to him in between his spread legs, but his attempt was interrupted when the HR Manager entered his office.

43.

As with the prior incident, Ms. Cusatis was clearly offended by this conduct, and she immediately left GM Freas' office in disgust.

44.

On other occasions, GM Freas also made several comments, some of a sexual nature, to and about Ms. Cusatis.

45.

On February 3, 2020, another female employee (hereinafter, "J.C.") complained to management about GM Freas' conduct.

46.

When Mr. Cusatis heard about her coworker's complaint, she immediately recalled one situation where J.C. abruptly entered Ms. Cusatis' office and tried to hide in a corner of the room, out of view of the doorway.  While J.C. was in Ms. Cusatis' office, GM Freas pacing in the hallway just outside of Ms. Cusatis' door as though he were looking to see if J.C. was in Ms. Cusatis' office.  After he finally left and J.C. calmed down, J.C. asked Ms. Cusatis which direction GM Freas went before J.C. quickly walked in the opposite direction.

47.

As she was leaving, J.C. said that she did not want to get Ms. Cusatis in trouble because "we all know how he feels about you."

48.

This comment confirmed to Ms. Cusatis that other people had seen the inappropriate behavior and comments and that GM Freas may have made other comments about Ms. Cusatis to third persons.

49.

After getting the complaint from J.C., VP Wall contacted human resources to see if any other employees had complained about similar behavior from GM Freas.

50.

HR confirmed that Ms. Cusatis had complained about the behavior that GM Freas had displayed to Ms. Cusatis.

51.

However, HR had done nothing to address these concerns, and it is now apparent that HR failed to even document the complaint.

52.

VP Wall approached Ms. Cusatis and asked her to contact the company attorney in order to prepare a statement.  Ms. Cusatis said that she was not comfortable doing so since the attorney represented Defendant, not her.

53.

Ms. Cusatis asked if she could instead write her own statement about the events.  VP Wall advised Ms. Cusatis that this would be acceptable.

54.

On the morning of February 19, 2020, Ms. Cusatis sat down at her desk, and over the course about twenty minutes, she prepared a two-page statement concerning the sexual harassment of which she had been subjected by GM Freas.  Once she was done, Ms. Cusatis immediately printed her statement and took it to VP Wall in his office.

55.

Once VP Wall had reviewed Ms. Cusatis' statement, he responded, "that's a pretty powerful statement, but I don't think that my dad [CEO Wall] will be firing [GM Fres]."  VP Wall also said that he thought GM Fres should lose his job based on the allegations.

56.

Even though Defendant received complaints for four of its female employees, what VP Wall predicted turned out to be true.

57.

According to VP Wall, his recommendation to fire GM Freas was overruled by his father, CEO Wall.

58.

Instead of terminating GM Freas, Defendant merely demoted him to the position of Comptroller.  He was also advised not to interact with J.C.

59.

Ms. Cusatis spoke to CEO Wall about GM Freas; demotion, explaining that she did not think a mere demotion was a good idea.  CEO Wall responded to Ms. Cusatis' comment, laughing and saying that GM Freas was simply "trying to get a little piece of ass."

60.

Ms. Cusatis responded to CEO Wall's comment, saying that she did not think his comment was appropriate for the workplace.  CEO Wall's response was that he was the boss and he owned the company.

61.

On February 14, 2020, several days before Ms. Cusatis submitted her written statement to VP Wall, she initiated contact with the Equal Employment Opportunity Commission (hereinafter, "EEOC") with the intent of filing a charge of discrimination as a result of the aforementioned sexual harassment.

62.

However, Ms. Cusatis was ultimately unable to obtain an intake interview with the EEOC, and since it soon appeared that Defendant was taking some action against GM Freas and that matters appeared to be improving, Ms. Cusatis ultimately decided not to pursue a charge.

63.

However, over the course of about four months, GM Freas had begun to ignore Defendant's directive to avoid contact with J.C., management was failing to hold GM Freas accountable.

64.

As a result, GM Freas once again began to make J.C. uncomfortable to the extent that J.C. resigned from her position in May 2020.

65.

On the same day that J.C. resigned, Defendant fired GM Freas.

66.

J.C. subsequently sought to initiate criminal charges for sexual battery in the Municipal Court for the City of Pooler.  Ms. Cusatis appeared at a court appearance with J.C., but while J.C. told the Court some of Ms. Cusatis' anticipated testimony, J.C. did not call Ms. Cusatis as a witness.  Having heard J.C. tell the Municipal Court what Ms. Cusatis and the others would testify to, the judge even suggested that J.C. call Ms. Cusatis as a witness.

67.

Critically, the matter in Municipal Court was set for a hearing within a few days after Ms. Cusatis was ultimately terminated.

68.

As the court date approached in or around June 2020, and while she was still employed, Ms. Cusatis was served with a witness subpoena at work.

69.

It was likely around this point that Defendant became aware that its former employee had initiated a criminal complaint concerning the sexual harassment that she experienced at work due to GM Freas and that Ms. Cusatis had been identified as a witness to support the charges.

70.

Around the same time, on or about June 29, 2020, Defendant lost one of its commercial

accounts after one of Defendant's representatives attempted to negotiate with the customer over a lower rate for services.  Critically, this was a relatively small commercial account bringing in only about $300.00 per month in revenue.

71.

For perspective, over the last seven years of her employment with Defendant, Ms. Cusatis was responsible for increasing Defendant's revenue from around $400,000 to approximately $1,000,000.00 per month in only one of the profit centers for which she was responsible.

72.

The sales representative ultimately dropped the ball by failing to follow up with the commercial customer attempting to renegotiate their contract.  As a result, the commercial customer took its business elsewhere.

73.

Ms. Cusatis had no direct involvement in the loss of the customer at issue.

74.

On the same day that Defendant lost its customer, Ms. Cusatis happened to be meeting with VP Wall discussing other topics when the issue of the lost account came up.

75.

Ms. Cusatis explained what had occurred, but based on VP Wall's reaction, he did not appear upset, he did not act like it was a big deal, and nothing that VP Wall said or did made Ms. Cusatis believe that anyone's employment was at risk.

76.

However, later that afternoon, CEO Wall contacted Ms. Cusatis via telephone, and it was immediately apparent to Ms. Cusatis that CEO Wall was irate.

77.

CEO Wall began discussing wanting to make changes to Ms. Cusatis' department and having a "clean slate."  However, CEO Wall only mentioned terminating Ms. Cusatis, who was in her sixties, and her two subordinates, both in their fifties.

78.

CEO Wall did not mention firing the youngest sales representative in the department.  And since she – like two of the three individuals CEO Wall did threaten to fire – had nothing to do with the loss of the account, the only apparent difference was her relative youth.

79.

As CEO Wall then said to Ms. Cusatis, "[g]o ahead and pack your stuff then.  You're fired." CEO Wall also told Ms. Cusatis to clear her desk.  He said that Ms. Cusatis could come back the following day to pick up her severance payment.

80.

At the end the call, Ms. Cusatis packed her things, and that was the end of her twenty-something year tenure working for Defendant.

81.

The termination of Ms. Cusatis had nothing to do with the loss of the customer account.

82.

In fact, when VP Wall found out that Ms. Cusatis has been terminated, he immediately contacted his father to advise CEO Wall that he did not agree with the termination.

83.

Within approximately one hour from the time that Ms. Cusatis her workplace for the last time, VP Wall called Ms. Cusatis in an attempt to get Ms. Cusatis to return.  He even told Ms.

Cusatis that his father had not intended to fire her. Yet, this was something that Ms. Cusatis would ever hear directly from CEO Wall.

84.

VP Wall would make several more attempts to convince Ms. Cusatis to return over the course of the next year.

85.

However, as a result of the way that she had been treated by GM Freas and CEO Wall, and the way that Defendant failed to appropriate handle the complaints made by Ms. Cusatis and GM Freas' other accusers, Ms. Cusatis was not interested in returning to work.

86.

Even if Ms. Cusatis had been interested in returning to work, each of VP Wall's proposals would have required Ms. Cusatis to take a demotion and substantially less compensation.

87.

Moreover, Defendant filled Ms. Cusatis' position with the youngest and least experienced of its Sales Reps.

88.

Historically, Defendant has paid severance to its upper-level employees, including GM Freas, who, after Defendant *finally* terminated his employment nearly four months after he was accused by multiple employees of sexual harassment, also received such a severance.

89.

On the other hand, Ms. Cusatis never received the severance payment that CEO Wall had promised.

90.

Defendant continued to subject Ms. Cusatis to retaliation after she was fired. Defendant made numerous attempts to prevent Ms. Cusatis from obtaining unemployment benefits, including by refusing to provide Ms. Cusatis with a Georgia Department of Labor Separation Notice that she would need to get benefits.

91.

Defendant also attempted to prevent Ms. Cusatis from receiving unemployment benefits by opposing her claim and by making knowingly false statements to the Georgia Department of Labor that Ms. Cusatis had resigned voluntarily instead of being fired.

92.

Defendant was aware that Ms. Cusatis had been working in the solid waste industry for decades, even prior to her employment with Defendant.  This knowledge would suggest that, when Defendant threatened Ms. Cusatis in the event that she sought work in this field over the next two years, this demonstrates Defendant's retaliatory animus.

Procedural Background

93.

After making initial contact with the Equal Employment Opportunity Commission through the submission of an initial inquiry on or around July 17, 2020, Ms. Cusatis submitted her Charge of Discrimination to the EEOC on October 15, 2020.  In her Charge of Discrimination, Ms. Cusatis alleged that she had been subjected to discrimination due to sex and age and retaliation for engaging in protected activities, all in violation of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.  The EEOC assigned Ms. Cusatis' Charge Number 415-2020-01181.

94.

Defendant had notice of Ms. Cusatis' Charge of Discrimination, participated in the proceedings before the EEOC, and was represented by counsel at that time.

95.

The EEOC subsequently issued its Determination and Notice of Rights dated March 9, 2022.  However, as reflected by the postmark, the EEOC did place such Notice of the Right to Sue in the mail until March 28, 2022, which Ms. Cusatis necessarily received at some point thereafter. The EEOC first issued the same notice electronically on June 6, 2022, and it was received by Ms. Cusatis, through counsel, the same day.

96.

As a result, Ms. Cusatis has exhausted her administrative remedies as to her Charge of Discrimination, and she is filing the instant action within ninety days of her receipt of the Notice of Right to Sue.

**COUNT I:**
**HOSTILE WORK ENVIRONMENT DUE TO SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

97.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 96, as if the same were set forth herein.

98.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate against or harass any of its employees on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

99.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

100.

To establish a claim of hostile work environment, a plaintiff must show 1) that she was subjected to harassment in the form of unwelcome verbal or physical conduct because of a statutorily protected basis; 2) that the harassment had the purpose of effect of unreasonably interfering with the work environment and/or created an intimidating, hostile, or offensive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

101.

Plaintiff is a member of a protected class in that she is female.

102.

As alleged herein, Defendant hired Jeff Freas in 2015 to serve as its General Manager. As Sales Manager, the General Manager was Plaintiff's direct supervisor.

103.

For the subsequent five years, Defendant's General Manager subjected not only Plaintiff, but Defendant's other female employees, to conduct of a sexual nature that was unwelcomed.

104.

Plaintiff was subjected to such unwelcomed and harassing conduct solely on account of her sex.

105.

As a result of this conduct, Plaintiff tried to avoid Defendant's General Manager whenever possible because the General Manager made Plaintiff uncomfortable.

106.

The General Manager continued to exhibit the conduct, even though he was aware that Plaintiff found such conduct hostile and abusive.

107.

As alleged herein, on one occasion in January 2020, the General Manager made unwanted physical contact with Plaintiff, spreading his legs in a sexually suggestive manner, then embracing Plaintiff and attempting to kiss Plaintiff on the mouth.

108.

While Plaintiff immediately reported the General Manager's conduct to Defendant's human resources representative, Defendant failed to take any remedial actions.

109.

As alleged herein, several days later on January 31, 2020, Defendant's General Manager made further attempts to make physical contact of a sexual nature with Plaintiff by placing his hand on the small of Plaintiff's back, pulling Plaintiff toward the General Manager in an apparent attempt to embrace Plaintiff, if not further contact of a sexual nature.

110.

Defendant's human resources representative was aware of the January 31, 2020 incident.

111.

Not only was human resources aware of the incident, it was only because of the human resources representative's abrupt entrance into the General Manager's office that such behavior ceased and Plaintiff was able to leave the office.

112.

Defendant's General Manager would also discuss Plaintiff around the workplace in a manner suggesting that the General Manager had romantic and/or sexual feelings for Plaintiff.

113.

As a result of the nature of these comments, it was apparent to Plaintiff's coworkers that Defendant's General Manager had romantic and/or sexual feelings for Plaintiff.

114.

After Defendant failed to address the harassment that Plaintiff experienced, Defendant's General Manager apparently sexually assault another one of Plaintiff's colleagues.

115.

After Plaintiff's colleague complained to her supervisors about the General Manager's conduct, Defendant's Vice President became aware of Plaintiff's prior complaints to human resources, and the Vice President specifically requested that Plaintiff provide additional information.

116.

Even though Plaintiff prepared thorough written statement concerning the harassment she experienced, Defendant still failed and refused to take meaningful corrective action against the individual responsible.

117.

It is apparent that Defendant did not take Plaintiff's complaints about the harassment seriously, as even Defendant's President and Chief Executive Officer laughed about what had occurred and further stating that the General Manager was just "trying to get a little piece of ass."

118.

As alleged herein, the harassment of which Plaintiff was subjected not only unreasonably interfered with the work environment, but it made Plaintiff feel uncomfortable and otherwise created an intimidating, hostile, and offensive work environment.

119.

As alleged herein, Defendant's failure and refusal to address Plaintiff's complaints of harassment not only unreasonably interfered with the work environment, but created an intimidating, hostile, and offensive work environment.

120.

Any reasonable person in Plaintiff's position would find all of the alleged conduct, individually or taken together, extremely offensive.  Accordingly, Plaintiff was subjected to conduct that was objectively offensive.

121.

Similarly, several of Plaintiff's former coworkers found the conduct that Plaintiff was subjected objectively offensive.

122.

Plaintiff found the alleged conduct subjectively offensive and unwelcomed.

123.

The harassment that Plaintiff experienced was both severe, and given that she experienced it on a near-daily basis, the harassment was pervasive in the workplace.

124.

Because it was Plaintiff's direct supervisor who was responsible for the harassment, Defendant is liable for such conduct.

125.

Because Defendant's upper-most management was aware of the harassment, and Plaintiff's complaints, but failed and refused to take appropriate remedial action, Defendant is liable for the conduct.

126.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the aforementioned offensive conduct.

127.

Plaintiff has been injured by Defendant's harassment and hostile work environment, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of no less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**AGE DISCRIMINATION**
**IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

128.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 96, as if the same were set forth herein.

129.

Pursuant to the Age Discrimination in Employment Act, it is unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of their employment because of such individual's age. 29 U.S.C. § 623.

130.

Plaintiff is between the ages of forty and seventy.

131.

As alleged herein, Plaintiff was qualified for the position of Sales Manager.

132.

Plaintiff had been employed with Defendant for approximately twenty years, and she had served in the position of Sales Manager for around seven years, and at all times her performance was exemplary.

133.

As alleged herein, Beginning around the time that Plaintiff turned sixty years of age, she had multiple reasons to believe that her termination would be imminent.

134.

Specifically, Defendant's Chief Executive Officer made comments to third parties that he intended to demote Plaintiff, and suggesting that the sole reason was her age.

135.

Defendant's Chief Executive Officer would also make comments directly to Plaintiff implying, not for any performance related reason, that she was losing her mental acuities solely because of her age.

136.

Defendant's Vice President often made comments suggesting that he preferred to have younger individuals serving in management positions.

137.

On at least one occasion, Defendant's Vice President referred to Plaintiff in a conversation with a third-party as a "dinosaur."

138.

In January 2020, prior to the events underlying Plaintiff's claims of harassment, Plaintiff learned that Defendant was seeking applications for the position that she would continue to hold for another five months.

139.

Moreover, just before she was later fired, a third party made a comment to Plaintiff that suggested that Defendant's Chief Executive Officer was going to terminate Plaintiff's employment.

140.

On June 29, 2020, Defendant threatened to fire Plaintiff, along with two other employees in her department who were in their fifties.

141.

On the same day, June 29, 2020, Defendant abruptly terminated Plaintiff's employment.

142.

When Defendant later filled Plaintiff's former position, Defendant replaced Plaintiff with an employee who was substantially younger that Plaintiff, even though the other person lacked the same qualifications and experience as Plaintiff.

143.

Defendant will be unable to present any evidence of a legitimate nondiscriminatory motive for terminating Plaintiff's employment and otherwise treating Plaintiff less favorably than her counterparts who were younger than Plaintiff.

144.

Plaintiff will prove that the Defendant's stated reasons are pretextual, were willful and indeed motivated by Plaintiff's age.

145.

Plaintiff has been injured by Defendant's discrimination based on age, and she is entitled to all damages allowed under the Age Discrimination in Employment Act, including back pay including fringe benefits, front pay or reinstatement, injunctive relief, liquidated damages, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT III:**
**RETALIATION**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

146.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 96, as if the same were set forth herein.

147.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to retaliate against an employee because they have opposed any unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a). Similarly, it is unlawful to retaliate against an employee who has made a charge, testified, assisted, or participated in an investigation or proceeding. *Id.*

148.

Beginning in January 2020, Plaintiff made reports to Defendant's human resources representative that Plaintiff was being subjected to sexual harassment by her supervisor.

149.

On or about February 14, 2020, Plaintiff made initial contact with the Equal Employment Opportunity Commission for the purposes of making a charge of discrimination concerning the sexual harassment for which she had been subjected.  While Plaintiff did not ultimately pursue her charge, it is possible that Defendant was aware of Plaintiff's activities.

150.

On or about February 19, 2020, Plaintiff submitted a written complaint to Defendant concerning the sexual harassment of which she was being subjected by her supervisor

151.

After Defendant demoted the individual responsible for the harassment, Plaintiff discussed the matter with Defendant's Chief Executive Officer, making her objection known as to Defendant's refusal to terminate the aggressor's employment.

152.

Shortly before her termination, Plaintiff appeared in a criminal court, and she was prepared to testify as to the harassment that she and her coworkers had been subjected.

153.

In June 2020, Plaintiff was served with a subpoena while at work for the purposes of providing testimony in support of the criminal complaint concerning the sexual harassment and assault that Plaintiff's coworker experienced in Defendant's workplace.

154.

As a result of Plaintiff's participation in the protected activities alleged herein, Defendant terminated Plaintiff's employment on June 29, 2020, Defendant refused to provide Plaintiff with severance compensation as it normally does for senior-level employees, Defendant took specific measures in an attempt to prevent Plaintiff from receiving unemployment benefits, and Defendant also tried to prevent Plaintiff from securing other employment opportunities in the solid waste industry.

155.

Defendant will be unable to present any evidence of a legitimate nondiscriminatory motive for terminating Plaintiff's employment, refusing to provide Plaintiff with severance compensation, attempting to prevent Plaintiff from receiving unemployment benefits, or for trying to prevent Plaintiff from securing other employment opportunities in the solid waste industry.

156.

Plaintiff will prove that the Defendant's stated reasons are pretextual, were willful and indeed motivated by Plaintiff's participation in protected activities and Defendant's retaliatory motive.

157.

Plaintiff has been injured by Defendant's retaliatory conduct in response to Plaintiff's participation in protected activities, and Plaintiff is entitled to all damages allowed under the Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in the amount of no less than $300,000.00, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Theresa Cusatis respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant Atlantic Waste Services, Inc., and that Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff on Count I for discrimination based on sex, specifically for subjecting Plaintiff to harassment and a hostile work environment, and grant Plaintiff all relief allowable under Title VII of the Civil Right Act;

4)      That judgment be awarded for and in favor of Plaintiff on Count II for discrimination based on age, and grant Plaintiff all relief allowable under the Age Discrimination in Employment Act;

5)      That judgment be awarded for and in favor of Plaintiff on Count III for retaliation for participating in protected activities, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act; and,

6)      For such other relief as this Court shall seem just and proper.

Respectfully submitted, this 24th day of June, 2022.

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
emw@cooperbarton.com

KENNETH E. BARTON III
Georgia Bar No. 301171
EMILY M. WALKER
Georgia Bar No. 221826
*Attorneys for Plaintiff*